<u>NOT FOR PUBLICATION</u>

## UNITED STATE DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| OROLOGIO OF SHORT HILLS, INC. and OROLOGIO INTERNATIONAL LTD., INC., | Civil Action No. 11-6854 |
| Plaintiffs, | **OPINION** |
| v. | July 23, 2015 |
| THE SWATCH GROUP (U.S.) LTD., INC., |  |
| Defendant. |  |

**WIGENTON**, District Judge.

Before this Court is The Swatch Group's ("Defendant" or "Swatch") Motion for Summary Judgment pursuant to FED. R. CIV. P. 56.  Orologio of Short Hills and Orologio International Ltd. (collectively, "Plaintiffs" or "Orologio") move for Partial Summary Judgment pursuant to FED. R. CIV. P. 56 and to Strike Defendant's Answer and for other sanctions based upon Defendant's spoliation of evidence ("Motion to Strike").  This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331.  Venue is proper pursuant to 28 U.S.C. § 1391.

For the reasons discussed below, this Court **GRANTS** Defendant's Motion for Summary Judgment. As such, Plaintiffs' Partial Motion for Summary Judgment is **DENIED** as **MOOT**. Plaintiffs' Motion to Strike is **DENIED**.

<u>FACTUAL BACKGROUND</u>

In 1988, Orologio opened a store formerly located at the Garden State Plaza Mall in Paramus, New Jersey.  (Compl. ¶¶ 10, 12.)  In 1994, it opened a store at The Mall at Short Hills in

1

Short Hills, New Jersey. (*Id.* at ¶ 12.) Orologio is a retailer of high-end watches who allegedly competes with retailers in the "cross-elastic" "New Jersey/New York" market. (*Id.* at ¶¶ 1, 14-16.) From the outset, Orologio sold Swatch's Omega products.[1] (*Id.* at ¶ 12.)

Swatch is a corporation with its principal place of business located in Weehawken, New Jersey. (Compl. ¶ 7.) It is a subsidiary of The Swatch Group, Ltd., a Swiss Holding Company that owns various watch brands. (Dkt. No. 109, Ex. B, ¶ 2.) Among these brands, Omega is a high-end watch brand. (*Id.*, Ex. B. ¶¶ 17-19; Ex. C., pp. 62, 71, 137; Ex. D, ¶ 18.) Swatch sells Omega via authorized dealers, such as Orologio. (*See id.,* Ex. C, pp. 180-182.) Authorized dealers buy Omega from Swatch and then resell it to customers. (*Id.*) Dealers may cease selling Omega at any time. (*Id.*, Ex. C, pp. 64-65, 154-156, 261; Ex. B ¶ 19.)

Swatch contends that no written agreement exists between it and Orologio within the meaning of the New Jersey Franchise Practices Act, N.J.S.A. § 56:10-3 ("NJFPA"). (Dkt. No. 109, Ex. B, ¶¶ 5-7; Ex. C, pp. 154-156, 261, 263; Ex. D, ¶¶ 2-3, 10.) Orologio, however, primarily argues that the following constitute written arrangements under the NJFPA: (a) a "Brand Policy Statement" issued by Swatch to all authorized dealers detailing how to handle, display, and present Omega at the retailer's store. (*Id.*, Ex. C, pp. 86, 89.); (b) Swatch's written Internet Brand Policy for the use of its proprietary images and products on the retailer's website. (*Id.*, Ex. E, pp. 78-79.); (c) Swatch's "Selective Distribution Program," which was used to govern its selection of dealers authorized to sell Omega products. (*Id.*, Ex. B, ¶¶ 14, 17-18; Ex. C, pp. 76-77, 79; Ex. D, ¶ 18.); and (d) a voluntary "Partner Plan" program administered by Swatch to enable dealers to obtain a flat fee percentage credit on future sales in exchange for dealers achieving a mutually agreed-upon

---

[1] Plaintiffs sold several major brands, including its biggest seller, Breitling. (Dkt. 1 ¶¶ 30; State Ct. Verified Compl. ¶¶ 14, 49, 65, Ex. H; Orologio Sales Reports 2011-2014, Ex. N.)

2

minimum sales threshold. (*Id.*, Ex. B, ¶¶ 9, 11-13; Ex. C, pp 149-152, 154, 162; Ex. D, ¶¶ 12-14). The program required all dealers to carry a sixty-five unit minimum assortment of Omega watches. (*Id.*, Ex. C, pp. 128-129, 131, 132-133.) Orologio participated in the Partner Plan. (*Id.,* Ex. A, 171.) Orologio accumulated the following credits under the Partner Plan: $2,394 in 2004 and $788 in 2005. In 2007, Orologio did not participate in the Partner Plan. (*Id.*, Ex. B. ¶ 12; Ex. M.) In 2008-2009, it did not achieve the required sales goals that would have triggered a credit. (*Id.*)

Additionally, Omega's "Co-op Commitment Agreement" allowed authorized dealers to apply to Swatch for advertising support. (*Id.*, Ex. C, pp. 168, 170-172, 175-176, 185, 192, 196, 206; Ex. E, pp. 109-110; Ex. F pp. 75-77, 80.) The co-op support program is separate from the Partner Plan program. (*Id.*, Ex. C, pp. 153, 168, 185.) Co-op support was advertising in which the dealer and Swatch shared the costs of advertising equally. (*Id.*, Ex. E, 33; Ex. F, 28-29, 80, 84-86; Ex. L, 87.) Although Orologio claims that after 2007 dealers had inadequate notice of the co-op policy, all authorized dealers could apply for, and present, a co-op or media plan to Swatch. (*Id.* Ex. C, pp. 170-172, 175, 192, 196.) Two types of co-ops exist: a dealer Co-op Commitment Agreement and a Brand-Initiated Co-op Commitment Agreement. (*Id.* at 205.) Swatch allocated co-op support to dealers on a case-by-case basis.[2] (*Id.*, Ex. E, pp. 109-110.) Orologio received co-op advertising support "over the more than 20-year relationship," including in 2006. (*Id.*, Ex. A, 113-116.)

Additional support existed. First, dealers were sometimes "tagged," or referenced, in Swatch-initiated advertisements. (*Id.*, Ex. C, 280.) Dealers did not pay to be tagged in such

---

[2] Allegedly, Orologio requested co-op support on an ongoing basis, but was told there was no money. (Dkt. No. 109, Ex. A, 113-117.) Swatch asserts that Orologio's co-op inquiries were general and that Orologio never proposed a specific co-op proposal. (Dkt No. 109, Rule 56.1 Statement, 6:38).

3

advertisements. (*Id.*, Ex. C, 227.) Orologio's witness testimony could not verify whether it had made a specific request for tagging. (*Id.*, Ex. A, 113.) Second, dealers could also request that Swatch pay a slotting fee in exchange for placing Swatch's pieces in prime shelf space in the store.[3] In testimony, Orologio did not confirm that it had specifically requested a slotting fee. (*Id.*, 173-176.)

As a part of its branding strategy, Swatch provided free training and education to its authorized dealers. (*Id.*, Ex. B, ¶ 20; Ex. C, pp. 117-118.) It also furnished free displays to dealers, including the "James Bond" and "NASA Moon Landing" displays given to Orologio. (*Id.*, Ex. B, ¶¶15-18; Ex. C, pp. 121-122.) Swatch sponsored a special event for Orologio at the Garden State Plaza Mall store, for which it paid for an exhibit of a NASA lunar module. Swatch also provided custom display cases to Orologio for display of Omega products. (*Id.*, Ex. A, pp. 267-269.) Swatch placed authorized dealers on its website so that customers interested in its products may purchase from them. (*Id.*, Ex. A, pp. 244-246.) Although Orologio store information was located on the website, for some temporary period of time, Orologio was excluded from the website's map of company stores due to error. (*Id.*) Despite Orologio's testimony suggesting a strong likelihood that Orologio lost business due to this temporary lapse, it has not specifically identified lost sales or customers. (*See id.*)

Although all authorized dealers had the same ability to order products from Swatch, limited edition items were made available on a "first-come-first-served" basis to all authorized dealers in good credit standing. (*Id.*, Ex. C, pp. 249, 261; Ex. E, pp. 187-188.) As a result, Orologio did not receive at least two limited edition watches. (*Id.*, Ex. E, pp. 189:4-190:16.) Therefore, Orologio

---

[3] Slotting fees have been provided to only one retail store (Tourneau), because of exceptional positioning in its New York City and Las Vegas stores. (*Id.*, Ex. C, pp. 243-247.)

enrolled in the Selective Distribution program in order to obtain better access to Swatch's products. (*Id.*, Ex. A, pp. 293-295.)

Orologio was allegedly placed on credit hold because "periodically" in the years after 2009 its payments were "past due." (*Id.*, Ex. E, 198.) Orologio also allegedly did not maintain monthly assortments or required product replenishments for Swatch's Omega products. (*Id.*, Ex. E, pp. 197-200; Ex. G.)

On April 18, 2011, Swatch terminated Orologio as an authorized dealer because Swatch was in the process of opening an Omega boutique in the same mall. (*Id.*, Ex. C, pp. 267-268, 274, 277.) Swatch claims that it opened the company store consistent with an industry-wide trend away from authorized "mom-and-pop" dealerships and toward company stores. (Dkt. No. 109, Def.'s Br., 8.) Orologio's business actually increased after it was terminated as an Omega dealer. (*See* Orologio Sales Reports 2011-2014, Ex. N.)

**PROCEDURAL HISTORY**

On May 10, 2011, Orologio filed a lawsuit alleging a violation of the New Jersey Franchise Practices Act against Omega USA in New Jersey Superior Court, Chancery Division, General Equity Part, Essex County ("New Jersey Superior Court"). (*Id.*, Ex. H.) Orologio requested a preliminary injunction against Swatch's termination of Orologio as an authorized dealer. (*Id.,* Ex. I, pp. 4:5-5:6.) On June 8, 2011, that court denied the request after oral argument. (*Id.*, Ex. J.) On August 10, 2011, the New Jersey Superior Court, Appellate Division, denied Orologio's motions for leave to appeal and summary disposition. (*Id.*, Ex. K.)[4]

---

[4] Orologio asserts that the parties agreed to a voluntary dismissal without prejudice. (Dkt. No. 126, 7:33.)

5

Orologio filed its Complaint in this Court on November 22, 2011. (Dkt. No 1.) It alleges: a violation of the Robinson-Patman Act ("Count I"), a violation of the New Jersey Franchise Practices Act ("Count II"), and a breach of the covenant of good faith and fair dealing ("Count III"). (Compl. ¶¶ 80-100.) Orologio further seeks a declaratory judgment and injunctive relief ("Count IV"). (*Id.* at ¶ 101-103.)

On January 19, 2015, Orologio moved for partial summary judgment pursuant to FED. R. CIV. P. 56 with respect to its Robinson-Patman Act, 15 U.S.C. § 13, claims (Count I).[5] (Dkt. No. 103.) On January 26, 2015, Swatch filed its brief in opposition. (Dkt. No. 112.) On February 20, 2015, Orologio filed its reply. (Dkt. No. 125.)

On January 19, 2015, Swatch moved for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 109). On February, 4, 2015, Orologio filed its brief in opposition. (Dkt. No. 118.) On February 20, 2015, Swatch filed its reply. (Dkt. No. 126.)

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

---

[5] On January 19, 2015, Orologio moved to strike Swatch's Answer and for other Sanctions based on Swatch's alleged spoliation of evidence, namely, the tagged Omega commercials. (Dkt. No. 106.) On January 26, 2015, Swatch filed its brief in opposition. (Dkt. No. 113.) On February 20, 2015, Orologio filed its reply. (Dkt. No. 124.) This Court finds that Orologio has failed to show bad faith on Swatch's part, or an attempt to obstruct Orologio, or that there was actual spoliation by Swatch. *See Bull v. United Parcel Service*, *Inc*., 665 F.3d 68, 73 (3d Cir. 2012). Orologio's issues regarding the commercials to support its "tagging" claim are weak. The actual commercials are not required to prove that claim, as there are many other avenues available for proof. Accordingly, the Motion to Strike is denied in its entirety, including the adverse negative inference and attorneys' fees requests.

*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." (*Id.* at 248.) A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322-23.

Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible.  *S.E.C. v. Antar*, 44 Fed. Appx. 548, 554 (3d Cir. 2002).

**DISCUSSION**

  **I.     New Jersey Franchise Practices Act ("NJFPA")**

To maintain a claim under the NJFPA, Orologio must prove it had a franchise arrangement with Swatch.  *See Neptune T.V. & Appl. Serv., Inc. v. Litton Microwave Cooking Prods. Div., Litton Sys., Inc.*, 190 N.J. Super. 153, 158 (App. Div. 1983).  The NJFPA provides:

> "Franchise" means a <u>written arrangement</u> for a definite or indefinite period, in which a person grants to another person a <u>license</u> to use a trade name, trade mark, service mark, or related characteristics, and in which there is a <u>community of interest</u> in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J.S.A. § 56:10-3(a) (emphasis added).  Hence, to determine whether the relationship between Orologio and Swatch constituted a franchise under the NJFPA, this Court must find that (1) Swatch granted a license to Orologio, and (2) there was a "community of interest" between the parties. *See Colt Indus., Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 119 (3d Cir. 1988).[6]

---

[6] In addition, the NJFPA applies only to:

> [A] franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next

### *A. Written Arrangement for a License*

Orologio contends that various documents issued by Swatch, including the Brand Policy Statement, Internet Brand Policy, Selective Distribution Program, and the voluntary Partner Plan, each constitute a "written arrangement" under the NJFPA. Orologio also argues that Swatch "granted" it a license to use Omega's trademarks.

This Court finds that Orologio is unable to point to any specific written arrangement granting it a license under the NJFPA. *See Finlay & Assocs., Inc. v. Borg-Warner Corp.*, 146 N.J. Super. 210, 219-20 (Law Div. 1976) (finding that under the NJFPA, the term "grant" "relates to the requirement of a writing," the word "license" "implies a proprietary interest," and "oral permission [is] not [] enough under the statute"). Moreover, no license was granted to Orologio because Swatch merely provided Orologio with advertising materials such as window and counter displays. (Swift Cert. ¶¶ 15-17, Ex. B; Swift Tr. pp. 121-122, Ex. C); *Colt*, 844 F.2d at 119 ("The [m]ere furnishing of advertising materials . . . does not fulfill the letter or intent of the Franchise Practices Act.") (quoting *Finlay*, 146 N.J. Super. at 219) (internal quotation marks omitted). Similarly, in *Colt*, the Third Circuit examined an agreement authorizing Fidelco to display Colt's trademark and to advertise that it was a Colt distributor. 844 F.2d at 119. The Third Circuit noted that "if this limited agreement constitutes a license to use a trademark, then any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license." *Id.* at 120.

---

preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise.

N.J.S.A. § 56:10-4(a).

The NJFPA license "is one in which the franchisee wraps himself with the trade name of the franchisor and relies on the franchisor's goodwill to induce the public to buy." *Liberty Sales Assocs., Inc. v. Dow Corning Corp.*, 816 F. Supp. 1004, 1010 (D.N.J. 1993). "The trademark, tradename reference means and implies use of that name in the very business title of the franchisee and a holding out or perhaps representation to the public of some special relationship or connection. Simply selling goods or distributing materials which bear the manufacturer's name or trademark does not license use of the trademark." *Finlay*, 146 N.J. Super. at 219 (internal quotation marks omitted). Here, Orologio "wrapped" itself around several major brands, including its biggest seller, Breitling. (Dkt. 1 ¶¶ 30; State Ct. Verified Compl. ¶¶ 14, 49, 65, Ex. H; Orologio Sales Reports 2011-2014, Ex. N.) There is no indication that a special relationship existed between the parties beyond Orologio's straightforward advertising and selling of Swatch's Omega watches. Therefore, this Court finds that the furnishing of advertising materials, coupled with Orologio's lack of reliance on Omega's brand, did not create a license under the NJFPA. As Orologio fails to satisfy a necessary element required to establish an NJFPA claim, summary judgment as to this claim is warranted.

### *B. Community of interest*

Even assuming, *arguendo*, that the license factor was satisfied, there was no community of interest between the parties. New Jersey courts analyzing the "community of interest" aspect focus on several factors, including: "(1) [the] licensor's control over the licensee, (2) the licensee's economic dependence on the licensor, (3) disparity in bargaining power; and (4) the presence of a franchise-specific investment by the licensee." *Cassidy Podell Lynch, Inc. v. Snydergeneral Corp.*, 944 F.2d 1131, 1140 (3d Cir. 1991). Economic dependence is the most important factor in the

community of interest inquiry. *Cooper Distrib. Co. Inc. v. Amanda Refrig. Inc.*, 63 F.3d 262, 272 (3d Cir. 1995).

This Court finds that Orologio and Swatch did not share a community of interest within the meaning of the NJFPA. Based on the record, there was a lack of control and dependence because Orologio had the freedom to choose whether to conduct business with Swatch. (Swift Tr. pp. 64-65, Ex. C.) Orologio was not economically dependent on Swatch, as Orologio relied on several high-end watch brands, not just Omega. More importantly, Orologio's business actually increased after it was terminated as an Omega dealer. (*See* Orologio Sales Reports 2011-2014, Ex. N.); *New Jersey American, Inc. v. The Allied Corp.*, 875 F.2d 58, 65 (3d Cir. 1989) (finding no community of interest because the plaintiff relied not only on the defendant's supplies but also on supplies from several manufacturers). Thus, the absence of a community of interest warrants summary judgment on the NJFPA claim.

**II.      Robinson-Patman Act ("RPA")**

The RPA, enacted in 1936, amended the Clayton Act's regulation of price discrimination by addressing fairness concerns for small distributors who were being threatened by the influx of chain stores. *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1422 (11th Cir. 1990). The RPA's goal is to ensure "that businessmen at the same functional level . . . start on equal competitive footing so far as price is concerned" and "to assure that all sellers regardless of size, competing directly for the same customers . . . receive evenhanded treatment from their suppliers." *FTC v. Sun Oil Co.*, 371 U.S. 505, 520 (1963); *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 356 (1967).

Orologio alleges violations of Sections 2(d) and 2(e) of the RPA.[7] Section 2(e) is substantially similar to § 2(d) except that § 2(e) prevents "a seller from providing services (as opposed to payments for services) to customers to be used in connection with the resale of goods unless the services are available to all competing customers on proportionally equal terms." *Hygrade Milk & Cream Co., Inc. v. Tropicana Products, Inc*., 1996 WL 257581, *12-13 (S.D.N.Y. May 16, 1996); *see also* 15 U.S.C. §§ 13(d), (e); *FTC v. Simplicity Pattern Co*., 360 U.S. 55, 65 (1959). Despite the slightly different language of these sections, courts apply the same analysis to both. *See World of Sleep, Inc. v. La–Z–Boy Chair Co*., 756 F.2d 1467, 1479 n. 6 (10th Cir.), cert. denied, 474 U.S. 823 (1985); *Hygrade Milk & Cream Co.,* 1996 WL 257581 at *12. In sum, §§ 2(d) and 2(e) require that purchasers "be given an equal opportunity to participate in certain types of seller programs relating to the resale of products, such as advertising and promotional programs, and that the benefits under those programs be disbursed on equal terms to purchasers in proportion to some objective value of their participation." *Alan's of Atlanta*, 903 F.2d at 1423. "Any method that treats competing customers on proportionally equal terms may be used. Generally, this can be done most easily by basing the payments made or the services furnished on the dollar volume or on the quantity of the product purchased during a specified period." 16 C.F.R. § 240.9(a).

Orologio fails to carry its burden in demonstrating who its actual competitors are. *See Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 166-68 (2006); *see also Motive Parts Warehouse v. Facet Enters.*, 774 F.2d 380, 390 (10th Cir. 1985) (noting that Sections §§ 2(d) and 2(e) require that "the favored and disfavored customers stand in some competitive relationship with one another"). In an effort to identify its competitors, Orologio cites

---

[7] Orologio's Complaint also briefly alleges price discrimination under RPA § 2(a). (Dkt. No. 1, ¶ 86.) This claim will be dismissed, as Orologio fails to advance any facts or evidence supporting the claim that Swatch offered discounted watches to favored dealers.

to the Fruda deposition, where a list of all Omega dealers that obtained co-op assistance in Connecticut, New Jersey, New York, and Pennsylvania was presented. (*See* Dkt. No. 121-13.) This Court is not persuaded that all Omega dealers that received co-op assistance were in fact competitors under the RPA, as the record is devoid of evidence of any competition between the dealers. Orologio also lists specific dealers in the New York City area that received tagging from Swatch, including London Jewelers, Wempe, Carat, JB Hudson, and Bachendorf's. There is no evidence, however, that these dealers compete with Orologio, and even if they were actual competitors, there is nothing in the record suggesting that tagging these specific dealers led to Orologio's lost sales. *See Godfrey v. Pulitzer Publ'g Co*., 276 F.3d 405, 411-12 (8th Cir. 2002) (holding that summary judgment was properly granted because the record showed only one instance of a lost sale and the expert failed to provide "any tangible evidence, numerical or anecdotal, to show that the [] dealers in fact compete" under the RPA). This lack of evidence alone is dispositive.

Even if Orologio had demonstrated who its actual competitors were, the record shows that Swatch offered proportionally equal opportunities to Orologio and its other dealers. Orologio primarily argues that Swatch discriminated against it in administrating the Partner Plan, the co-op program, tagging, and slotting fees. This Court will briefly discuss each program in turn.

### A. *Partner Plan*

The undisputed facts demonstrate that the Partner Plan was administered proportionally equal based upon the participating dealers' product turnover. The Partner Plan, which Orologio participated in, was a voluntary program that enabled dealers to obtain a flat fee percentage credit on future sales in exchange for dealers achieving a mutually agreed-upon minimum sales threshold. The program required all dealers to carry a sixty-five unit minimum assortment of

Omega watches. In 2008 to 2009, Orologio did not achieve the required sales goals that would have triggered a credit. Such volume requirements are acceptable under the RPA because they properly allow for service adjustments based upon the dealers' capabilities, such as was the situation here, where Orologio was placed on credit hold for past due payments. *See Simplicity Pattern Co.*, 360 U.S. at 61 n. 4. Hence, the Partner Plan presents no violation of the RPA.

### *B. Co-op*

This Court finds that the co-op program, which allowed dealers to apply for advertising support, complied with the RPA because Orologio had sufficient notice of the program. *See Labrador, Inc. v. Iams Co.*, 1995 WL 714454, *6 (C.D. Cal. Sept. 19, 1995), *aff'd*, 1997 WL 8450 (9th Cir. Jan. 8, 1997). Although Orologio claims that after 2007 dealers had inadequate notice of the co-op policy, all authorized dealers could apply for and present a co-op or media plan to Swatch. In fact, Orologio had adequate notice, as it had received co-op advertising support "over the more than 20-year relationship," including in 2006. As such, the co-op program complied with the RPA.

### *C. Tagging*

Orologio argues that Swatch improperly provided Orologio's alleged competitors free "tagging," or referencing, in Swatch-initiated advertisements without providing Orologio with notice of these opportunities. However, Orologio's witness testimony could not verify whether it had ever made a request for tagging, and there is no evidence that Orologio was unaware that it could make a tagging request. Therefore, this Court does not find support for improper tagging under the RPA.

### *D. Slotting Fees*

Similarly, Orologio argues that Swatch did not inform it of the opportunity to request that Swatch pay a slotting fee in exchange for placing Swatch's pieces in prime shelf space in the store. However, Swatch offered slotting fees to only one retail store, Tourneau, because of exceptional positioning in its New York City and Las Vegas stores. Because Swatch did not consider Orologio's positioning of Omega as conveying such value and because slotting fees themselves are generally not considered valuable, no RPA violation occurred. *See El Aguila Food Products, Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 632-33 (S.D. Tex. 2003), *aff'd*, 131 Fed. Appx. 450 (5th Cir. 2005).

**CONCLUSION**

For the reasons stated above, Orologio is not a franchise under the NJFPA. Additionally, Orologio fails to meet the required criteria for either a Section 2(d) or 2(e) claim. Accordingly, this Court **GRANTS** Defendant's Motion for Summary Judgment. As such, Plaintiffs' Partial Motion for Summary Judgment is **DENIED** as **MOOT**. Plaintiffs' Motion to Strike is **DENIED**.

                                                                  s/ Susan D. Wigenton, U.S.D.J.


Orig:       Clerk
cc:         Parties
            Magistrate Judge Steven C. Mannion